**UNITED STATES of America, Plaintiff–Appellee,**

v.

**James Ronson TAYLOR; Jamel Earleen White Taylor, Claimants– Appellants,**

and

**$61,433.04 U.S. Currency; One Tract of Real Property (Consisting of Two Lots) located in Wilson County, Wilson Creek Township, having the Street Address of 1699 Bynwood Circle, Wilson, North Carolina, and being more particularly described in a deed recorded in Book 1336, Page 902 of the Wilson County**

Registry, and being titled in the names of James Ronson Taylor and Wife, Jamel Earleen White Taylor, with all appurtenances and improvements thereon, and any and all proceeds from the sale of said property, Defendants.

No. 95–1961.

United States Court of Appeals, Fourth Circuit.

Argued June 5, 1996.

Decided July 26, 1996.

Before RUSSELL, WILKINS and NIEMEYER, Circuit Judges.

Affirmed by published opinion. Judge WILKINS wrote the opinion, in which Judge RUSSELL and Judge NIEMEYER joined.

## OPINION

WILKINS, Circuit Judge:

James Ronson Taylor and Jamel Earleen White Taylor appeal a decision of the district court denying their claims filed in this civil forfeiture action brought by the United States against $61,433.04 in United States currency and a tract of real property. *See* 18 U.S.C.A. § 981 (West Supp.1996); 18 U.S.C.A. § 1955(d) (West 1984). The Taylors principally assert that the district court erred in denying their motion to suppress the evidence offered by the Government to support the determination that the defendant properties were used or involved in illegal gambling because that evidence was seized as a result of a search that violated their Fourth Amendment rights. We affirm.

### I.

#### A.

At approximately 9:15 p.m. on September 8, 1991, Trooper Michael Lane of the North Carolina Highway Patrol and Sergeant Levi Williams of the Wilson County, North Carolina Sheriff's Department arrived at the Taylors' home. Their purpose was to return to Mr. Taylor pursuant to court order a handgun that had been seized from him during a traffic stop approximately 16 months earlier.

Evening had fallen by the time the officers drove into the driveway of the Taylors' residence, permitting the officers to see clearly through a large picture window on the front of the house into the well-lit dining room. Although vertical blinds hung in the window, both officers had an unobstructed view of two men seated at a table. The officers proceeded from the driveway, crossed the lawn, and climbed the stairs of the front porch. As they walked through the yard to the porch, they passed by the window, which was locat-

**ARGUED:** John Addison Shorter, Jr., Washington, D.C., for Appellants. Thomas Philip Swaim, Assistant United States Attorney, Raleigh, North Carolina, for Appellee. **ON BRIEF:** Janice McKenzie Cole, United States Attorney, Raleigh, North Carolina, for Appellee.

ed approximately eight feet to the left of the front door as the officers faced the house, and again observed one of the men in the dining room. After the officers knocked on the front door, Taylor opened it. He appeared startled and nervous at the appearance of the two uniformed officers, and immediately positioned his body in the opening of the door in a manner that prevented the officers from seeing into the interior of the house. When the officers explained the purpose of their visit and requested permission to enter the house in order to have Taylor sign a receipt for the firearm, he remarked either that he needed to secure his dog or that he needed to get his wife. Taylor then closed the door, and the officers heard it lock.

After the door closed, Trooper Lane heard "scurrying" sounds inside the house. Curious, the officer walked three steps to his left down the porch and glanced through the picture window. As before, the blinds were open sufficiently to permit an unobstructed view of the room. Trooper Lane observed the dining room table and the items that were atop it—a large amount of currency and what appeared to the officer to be a plastic bag containing white powder. He also saw individuals he was unable to identify moving around inside the house. Just before the blinds closed abruptly, someone threw a sheet over the table. Trooper Lane immediately called out to Sergeant Williams that "money and drugs [were] all over." J.A. 234. The two officers began knocking loudly on the front door and shouting to Taylor to open it.

Although he failed to respond to their entreaties for several minutes, Taylor finally opened the door. When he did, Trooper Lane explained that he had observed drugs and money on the table and that the officers needed to enter the house. While Trooper Lane spoke with Taylor, Sergeant Williams observed an automatic weapon on the dining room floor. Taylor made a comment about gambling, stepped aside, and opened the door, permitting the officers to enter the house. As they entered, the officers noticed several individuals in the living room area to their right, and, to Trooper Lane's left, some-

one was moving quickly into the dining room area toward the firearm. Trooper Lane pursued the man, later identified as Donnell Austin, into the dining room and pushed him to the ground. Trooper Lane unholstered his firearm and ordered Austin into the living room. By this time, Sergeant Williams had directed Taylor to move into the living room area as well. While waiting for assistance to arrive, the officers returned to the dining room and removed the sheet from the table, exposing gambling records and a large amount of currency. The bag containing white powder was no longer there.

One of the officers who responded to the request for assistance was Sheriff Wayne Gay. Upon his arrival, he spoke with Trooper Lane and Sergeant Williams for a report before confronting Taylor. Sheriff Gay then approached Taylor, introduced himself, and sought permission to search the house. Taylor inquired why the officers wished to conduct a search of the house, and Sheriff Gay explained that, based upon the observations that Trooper Lane had made through the window prior to the officers' entry into the house, the officers believed that criminal activity was underway. Taylor replied that the money was from gambling. After Sheriff Gay informed Taylor that gambling was illegal in North Carolina, Taylor asked that they speak privately. During the conversation that followed, Taylor informed Sheriff Gay that the currency was from a lottery operation, which Taylor served as the "bank." But, Taylor denied any direct involvement with drugs, stating that he was "guilty by association only." J.A. 269. When Sheriff Gay inquired whether there were illegal drugs on the premises, Taylor responded that there were not and consented to a search of the house. During the resulting search, officers discovered rolled coins and currency in other areas of the residence, which along with the currency seized from the dining room totalled approximately $61,-433. Additionally, officers seized records and paraphernalia indicating that a multi-million dollar gambling operation was being conducted from the residence.

## B.

The Government subsequently brought this in rem civil forfeiture proceeding against $61,433.04 in currency and the real property where the seizure was made. The Taylors filed claims to the property and moved to suppress the evidence obtained as a result of the search. They argued that suppression was appropriate because the vertical blinds on the picture window were closed such that Trooper Lane's visual intrusion into the dining room as he stood on the porch infringed their reasonable expectations of privacy and because no plastic bag containing a white powdery substance was present on the table. As such, they maintained, neither probable cause nor exigent circumstances existed for the officers' forcible warrantless entry into their home. They further asserted that Taylor's subsequent consent to the search of their home was tainted by the illegality of the prior searches.

Although the parties had submitted opposing affidavits setting forth conflicting material facts surrounding the search, the district court granted summary judgment to the Government without conducting an evidentiary hearing on the Taylors' suppression motion and without addressing their alternative argument that the forfeiture would constitute an excessive fine violative of the Eighth Amendment. In a prior appeal, we vacated that decision and remanded with instructions to the district court to conduct an evidentiary hearing to resolve the factual disputes underlying the suppression motion and, if the suppression motion were denied, to address the Taylors' Eighth Amendment argument. *See United States v. Taylor,* 13 F.3d 786, 790 (4th Cir.1994).

On remand, a magistrate judge conducted an evidentiary hearing and rendered proposed factual findings. *United States v. $61,-433.04 U.S. Currency,* 894 F.Supp. 906, 911–15 (E.D.N.C.1995). The magistrate judge concluded that the law enforcement officers who testified were credible and that Taylor was not. *Id.* Based on the officers' testimony, the magistrate judge found that the vertical blinds on the picture window were opened sufficiently to permit an unobstructed view into the dining room and that Trooper Lane had seen a plastic bag containing a white powdery substance on the table. *Id.* at 917, 920. Having concluded that the blinds were open and that the officers were on the porch lawfully, the magistrate judge ruled that Trooper Lane's observations through the window did not violate the Taylors' reasonable expectation of privacy, and thus the officer's observations did not constitute a search for Fourth Amendment purposes. *Id.* at 916–19.[1] Further, the magistrate judge determined that based on the information known to the officers at the time, probable cause existed to believe that Taylor was engaged in criminal activity and that exigent circumstances authorized the warrantless intrusion into the Taylors' home to prevent the imminent destruction of evidence of that activity. *Id.* at 920–21. The magistrate judge also found that Taylor freely and voluntarily consented to a search of the house, a search that led to the discovery of additional currency and other evidence of illegal gambling. *Id.* at 921–22.[2] Accordingly, the magistrate judge recommended that the Taylors' suppression motion should be denied. *Id.* at 924. Finally, turning to consider whether the forfeiture of the defendant property would amount to an excessive fine violative of the Eighth Amendment, the magistrate judge applied the instrumentality test adopted by this court in *United States v. Chandler,* 36 F.3d 358 (4th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1792, 131 L.Ed.2d 721 (1995), and concluded that the

---

1. The magistrate judge ruled in the alternative that Trooper Lane's observations from the porch into the dining room window were justifiable under the plain view doctrine. *Id.* at 919.

2. The magistrate judge, however, rejected the "argu[ment] that the evidence seized during the search of the claimants' residence should be admitted under either the 'protective sweep' theory . . . or under a 'search incident to arrest' theory."

*Id.* at 922–23. Although we question the correctness of the reasoning applied by the lower court with respect to these issues, we need not consider them in view of our conclusions that the evidence in the dining room was seized lawfully based on exigent circumstances and that the evidence seized from the remainder of the house was discovered pursuant to a valid consent search.

forfeiture of the currency and the real property would not constitute an excessive fine. *$61,433.04 U.S. Currency*, 894 F.Supp. at 924–27.

The district court thereafter adopted in full the report and recommendation submitted by the magistrate judge. *Id.* at 909–11. The Taylors appeal from this decision, again asserting that by looking into their dining room window, Trooper Lane violated their Fourth Amendment rights and, accordingly, that Taylor's subsequent consent to the search of the house was tainted by this illegal conduct. We first consider whether Trooper Lane violated the Fourth Amendment by looking into the Taylors' dining room.

## II.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" by governmental actors. U.S. Const. amend. IV; *United States v. Jacobsen*, 466 U.S. 109, 113, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85 (1984). In analyzing whether challenged conduct violated the protections afforded by the Fourth Amendment, the threshold question we must address is whether that conduct amounted to a search or seizure, recognizing that not every observation made by a law enforcement officer—even if consciously intended to disclose evidence of criminal activity—constitutes a search within the meaning of the Fourth Amendment. *See Illinois v. Andreas*, 463 U.S. 765, 771, 103 S.Ct. 3319, 3324, 77 L.Ed.2d 1003 (1983); *Tarantino v. Baker*, 825 F.2d 772, 775 (4th Cir.1987). Rather, "[a] 'search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed." *Jacobsen*, 466 U.S. at 113, 104 S.Ct. at 1656; *Andreas*, 463 U.S. at 771, 103 S.Ct. at 3324 ("If the inspection by police does not intrude upon a legitimate expectation of privacy, there is no 'search'. . . .").[3] Accordingly, our inquiry must focus on whether the Taylors "manifested a subjective expectation of privacy in

the object of the challenged search" and whether "society [is] willing to recognize that expectation as reasonable." *California v. Ciraolo*, 476 U.S. 207, 211, 106 S.Ct. 1809, 1811, 90 L.Ed.2d 210 (1986).

Because individuals ordinarily possess the highest expectation of privacy within the curtilage of their home, that area typically is "afforded the most stringent Fourth Amendment protection." *United States v. Martinez–Fuerte*, 428 U.S. 543, 561, 96 S.Ct. 3074, 3084, 49 L.Ed.2d 1116 (1976). However, " '[w]hat a person knowingly exposes to the public, even in his own home . . ., is not a subject of Fourth Amendment protection.' " *Ciraolo*, 476 U.S. at 213, 106 S.Ct. at 1813 (quoting *Katz v. United States*, 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967)). Thus, a law enforcement "officer's observations from a public vantage point where he has a right to be" and from which the activities or objects he observes are "clearly visible" do not constitute a search within the meaning of the Fourth Amendment. *Id.; United States v. Bellina*, 665 F.2d 1335, 1341–42 (4th Cir.1981).

The Taylors maintain that they exhibited an expectation of privacy in their dining room and the objects located on their dining room table by closing the vertical blinds on the picture window and that their expectation of privacy was reasonable. The district court, however, after hearing conflicting testimony concerning the position of the blinds, made a factual determination that the testimony of Trooper Lane and Sergeant Williams, who stated that the blinds were not closed and that the interior of the dining room was clearly visible both from the street, from the walkway to the house, and from the front porch, was credible, while Taylor's testimony that he had closed the blinds earlier in the evening was not credible. Because the factual finding by the district court that the position of the blinds did not prevent visual intrusion into the dining room is not clearly erroneous, we conclude that the Taylors exhibited no subjective expectation of privacy

---

**3.** "A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property." *Jacobsen*, 466 U.S. at 113, 104 S.Ct. at 1656. Un-

derstandably, the Taylors do not contend that Trooper Lane's observations through the dining room window constituted a seizure of their property.

in their dining room or the items clearly visible through the window. Further, the Taylors' front entrance was as open to the law enforcement officers as to any delivery person, guest, or other member of the public. *See United States v. Hersh,* 464 F.2d 228, 230 (9th Cir.) (per curiam), *cert. denied,* 409 U.S. 1008, 93 S.Ct. 442, 34 L.Ed.2d 301 (1972) (holding that observations by law enforcement officers through window adjacent to front door and on porch did not constitute a search within the meaning of the Fourth Amendment because the officers "were in a place where they had a right to be, and ... whatever they saw through the window was in plain sight"); *cf. United States v. Bradshaw,* 490 F.2d 1097, 1100 (4th Cir.) (recognizing that law enforcement officers "were clearly entitled to go onto defendant's premises in order to question him"), *cert. denied,* 419 U.S. 895, 95 S.Ct. 173, 42 L.Ed.2d 139 (1974).

> "Absent express orders from the person in possession against any possible trespass, there is no rule of private or public conduct which makes it illegal per se, or a condemned violation of the person's right of privacy, for any one openly and peaceably ... to walk up the steps and knock on the front door of any man's 'castle' ... whether the questioner be a pollster, a salesman, or an officer of the law."

*Hersh,* 464 F.2d at 230 (quoting *Davis v. United States,* 327 F.2d 301, 303 (9th Cir. 1964)). No fence surrounded the Taylors' home, nor was the property posted to prohibit trespassing. *See id.* Trooper Lane and Sergeant Williams arrived at the Taylors' home on a ministerial mission to return a handgun to Taylor; they approached the house from the driveway and proceeded directly to the front door. As they did so, the interior of the Taylors' dining room was well lit and plainly visible through the picture window located directly adjacent to the front door. And, having exposed their dining room and its contents to anyone positioned at the front entranceway of their home, the Taylors possessed no reasonable expectation of privacy in the dining room or its openly visible contents. Accordingly, the observations Trooper Lane made through the Taylor's dining room window did not constitute a search within the meaning of the Fourth Amendment.[4]

### III.

▮ Having rejected the Taylors' claim that Trooper Lane's observations violated the Fourth Amendment, the remaining objections the Taylors raise to the decision of the district court to deny their suppression motion are easily resolved. The district court accepted as credible Trooper Lane's testimony that he observed a large amount of money and what appeared to him to be illegal drugs on the Taylors' dining room table and that as he was looking through the window, someone inside the house quickly closed the blinds. Under these circumstances, the district court did not clearly err in finding that Trooper Lane had a reasonable basis for concluding that there was probable cause to believe that criminal activity was in progress in the house and that there was an imminent danger that evidence would be destroyed unless the officers immediately entered the house and took

---

**4.** The alternative holding of the district court, that Trooper Lane's observations were justified under the plain view doctrine, improperly conflated two analogous, but different, Fourth Amendment doctrines. This error is understandable given that our decisions have not always made a clear distinction between the two. *See, e.g., Bellina,* 665 F.2d at 1341–44.

Generally speaking, as explained above, observations by law enforcement officers of objects or activities plainly visible to the public do not constitute a search within the meaning of the Fourth Amendment. The plain view doctrine, however, permits law enforcement officers to *seize* evidence when: (1) "the seizing officer [is] lawfully present at the place from which the evidence can be plainly viewed"; (2) "the officer ... 'ha[s] a lawful right of access to the object itself' "; and (3) "the object's 'incriminating character must ... be "immediately apparent." ' " *United States v. Legg,* 18 F.3d 240, 242 (4th Cir.) (quoting *Horton v. California,* 496 U.S. 128, 136–37, 110 S.Ct. 2301, 2308, 110 L.Ed.2d 112 (1990)) (fourth alteration in original), *cert. denied,* —— U.S. ——, 114 S.Ct. 2761, 129 L.Ed.2d 876 (1994). Because Trooper Lane's observations through the dining room window did not even arguably amount to an illegal seizure, the plain view doctrine was not implicated. Instead, before Trooper Lane could properly seize the items he observed through the window, an adequate justification for entry into the Taylors' home— here, exigent circumstances—was required.

possession of it. *See United States v. Turner*, 650 F.2d 526, 528 (4th Cir.1981) (factual finding by district court that exigent circumstances exist reviewed for clear error; warrantless entry into residence justified when officers have probable cause to believe contraband is present that may be destroyed or removed before a warrant can be obtained). And, because neither Trooper Lane's observations through the dining room window nor the subsequent entry into the house and seizure of the evidence in the dining room violated the Fourth Amendment, there was no illegality to taint Taylor's otherwise admittedly voluntary consent to the search of the remainder of the house. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043–44, 36 L.Ed.2d 854 (1973) (evidence seized in warrantless search undertaken following consent is admissible). As such, the district court did not err in refusing to suppress the evidence obtained as a result of those observations.

## IV.

We have reviewed the Taylors' remaining arguments and find them to be without merit. Accordingly, we affirm the judgment of the district court.

*AFFIRMED.*