**UNITED STATES of America, Plaintiff,**

v.

**Troy BAKER, Defendant.**

**No. CR–3–99–098.**

United States District Court, S.D. Ohio, Western Division.

Jan. 3, 2003.

Leo Patrick Mulligan, L. Patrick Mulligan & Associates, Cheryll Antoinette Bennett, Federal Public Defender, Dayton, OH, for Defendant.

David J. Horne, United States Attorney's Office, Dayton, OH, for Plaintiff.

DECISION AND ENTRY OVERRULING DEFENDANT'S MOTION TO SUPPRESS STATEMENTS (DOC. # 18); DECISION AND ENTRY SUSTAINING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE (DOC. # 19); CONFERENCE CALL SET

RICE, Chief Judge.

Defendant Troy Baker ("Defendant" or "Baker") is charged in the Indictment with one count of violating 21 U.S.C. § 846, by attempting to manufacture 3, 4–methylenedioxymethamphetamine ("MDMA"), and one count of violating 21 U.S.C. § 843(a)(6), by possessing equipment which could be used to manufacture MDMA.[1] See Doc. # 10. Those charges are based upon evidence which was seized by law enforcement officials and statements which the Defendant made to officers on October 14, 1999. On that date, officers of the Brookville, Ohio, Police Department were called to Baker's residence, at 463 Rona Parkway, Brookville, in response to a call concerning a domestic dispute.

This case is now before the Court on Defendant's Motion to Suppress Statements (Doc. # 18) and his Motion to Suppress Evidence (Doc. # 19), with which Baker seeks the suppression of the evidence obtained by officers on October 14th. The Court conducted an oral and evidentiary hearing on those motions and the parties have filed post-hearing memoranda. See Docs. # 24 and # 25. The Court begins by reviewing the evidence that was presented at the hearing.

On October 14, 1999, Officers William Carsner ("Carsner"), John Minniear ("Minniear") and Michael Miller ("Miller") of the Brookville Police Department were dispatched to the residence which the Defendant shared with his girlfriend, Judy Williams ("Williams"), on a complaint relating to a domestic dispute.[2] When Carsner and Minniear arrived at that location,[3] Baker greeted them at the door. Williams was standing behind him. Transcript (Doc. # 22) at 4–5. Baker explained that Williams was moving out of the residence and that they had argued about her desire to take certain items of personal property when she moved. He stated that he wanted her to be removed from the residence so that there would not be hostilities. Id. at 5. When the Defendant stepped back from the door, the two officers entered the residence.[4] Id. at 9.

The two officers, Baker and Williams walked into the living room. Id. at 6.

---

1. MDMA is also known as "ecstasy." See e.g., United States v. Cooper, 203 F.3d 1279, 1283 (11th Cir.2000); United States v. Hazut, 140 F.3d 187, 189 (2nd Cir.1998).

2. Williams had made the complaint.

3. Carsner and Minniear arrived at that residence before Miller.

4. There is no evidence that either the Defendant or Williams expressly invited Officers Carsner and Minniear to enter.

Approximately two or three minutes later, Miller entered the apartment.[5] *Id.* In accordance with established procedures of the Brookville Police Department, the officers separated Baker and Williams in order to question each about the domestic dispute which had brought them to Baker's home. *Id.* at 9–10, 19. Minniear accompanied Williams to a bedroom, while Miller remained in the living room with the Defendant.[6] *Id.* at 19. After Miller had questioned the Defendant, he walked towards the bedroom in order to confer with Minniear, who was continuing to interrogate Williams. *Id.* at 20. Since Miller wanted to allow Minniear to finish interrogating Williams, he walked into the kitchen to wait for that interrogation to end.[7] *Id.* at 57.

When he entered the kitchen, Miller was struck by the odor of rubbing alcohol and, as a consequence, looked around that room. *Id.* at 27. He observed a machine which could be used to roll marijuana cigarettes, marijuana seeds, bits of marijuana, several empty plastic bags, rolling papers and a pipe. *Id.* On the counter next to the kitchen sink, Miller saw four bottles of rubbing alcohol, glass beakers, several plastic funnels and a basket strainer, inside of which was a round bottomed beaker that contained a brown liquid. *Id.* Miller also saw a pan which contained a clear liquid, which he believed to be rubbing alcohol. *Id.* Several glass tubes and a glass thermometer were soaking in the pan. *Id.* at 27–28. In addition, Miller noticed a gallon of muriatic acid on the kitchen table. *Id.* at 28. When he looked

into the kitchen sink, he saw that it was stained. *Id.*

After making his observations, Miller conferred with Minniear concerning the domestic dispute call which had brought the officers to Baker's residence. *Id.* at 35. The officers informed Baker that he was not going to be arrested and that Williams was planning to stay in the residence. *Id.* at 36. After conveying to Baker the resolution of the domestic dispute, Miller and Minniear questioned Baker about the items the former had seen in the kitchen. *Id.* at 38. Baker indicated that the rolling papers and machine belonged to Williams. *Id.* at 23. He also explained that he was an amateur chemist and that his hobby was to experiment with chemicals. *Id.* at 38. Baker's explanation did not satisfy the officers; rather, they decided to call their Chief of Police and Detective Gary Hutton ("Hutton") of the Brookville Police Department.[8] *Id.* at 40–41. In addition, Miller asked to be shown Baker's chemistry set, whereupon the Defendant took that officer to his bedroom. *Id.* at 43. Once inside the bedroom, Miller saw a number of Mason jars which contained a yellow liquid. *Id.* at 23. Baker told Miller that the jars contained sassafras oil, which Baker said was used for aroma therapy. *Id.* at 23–24, 43.

After Hutton had arrived at Defendant's residence,[9] Miller took him inside and showed him what he had observed. *Id.* at 44, 60. Thereafter, Hutton and Miller walked outside, where they discussed how to proceed. They decided to ask Baker for permission to search his residence. *Id.* at

---

5. There is no evidence that Miller ever sought permission to enter Baker's residence.

6. Carsner positioned himself in a hallway between the living room and the bedroom.

7. The kitchen and the bedroom were next to each other, at the end of a hallway.

8. During the evidentiary hearing, Miller explained that he suspected that the tubes he had seen in the kitchen could be used to smoke marijuana or crack cocaine. Doc. # 22 at 41.

9. No evidence was presented that Hutton sought permission from Baker or Williams to enter their home.

63. When Hutton and Miller reentered that structure, Hutton presented a consent to search form to Baker, who signed it. *See* Government Exhibit 1.

Officers assigned to the Combined Area Narcotics Enforcement Task Force ("CANE unit") were called to Baker's residence in order to assist in the search, including Dean Derenberger ("Derenberger"), who was employed by the Ohio Bureau of Criminal Investigation and assigned to the CANE unit. Doc. # 22 at 69. As other officers began to search the Defendant's residence, Derenberger asked Baker to step outside so that he could ask him some questions. *Id.* at 71. Derenberger and Miller escorted Baker to a patrol car, where the interview took place, with both Baker and Derenberger sitting in the back seat of that vehicle. *Id.* However, before he asked Baker any questions, Derenberger read the *Miranda* warnings to him. *Id.* at 72. The Defendant indicated that he understood his rights and that he was willing to answer Derenberger's questions. *Id.* at 72–73. Thereafter, the Defendant told Derenberger that he had been manufacturing an organic variety of MDMA, which he did not believe to be illegal, since it was made with natural ingredients. *Id.* at 73.

Subsequently, the Defendant, having been taken into custody, was transported to the Brookville Police Department to be processed.

As is indicated, Defendant has requested that the Court suppress both the physical evidence that was seized when his residence was searched and any statements he made to officers on October 14th. As a means of analysis, the Court will initially discuss Defendant's request to suppress the physical evidence, following which it will turn to his request to suppress his statements.

## I. Physical Evidence: Defendant's Motion to Suppress Evidence (Doc. # 19)

Officers seized evidence from Defendant's residence, after he had signed a consent to search form. The Defendant argues that he did not validly consent to that search, because it was proceeded by violations of his Fourth Amendment rights. In particular, Baker contends that he was unlawfully detained, after the officers had resolved the domestic dispute which had initially caused them to travel to his residence, and, further, that Miller searched his residence in violation of the Fourth Amendment, prior to the time that he signed the consent form. Although this Court cannot agree with the Defendant that his Fourth Amendment rights were violated in either manner, it concludes that the Government has failed to meet its burden of proving by the preponderance of the evidence that Baker voluntarily consented to the search of his residence. The Court begins by setting forth its reasons for rejecting Defendant's contentions that his rights under the Fourth Amendment were violated, following which it will set forth its reasons for concluding that the Government has failed to meet its burden of proof on the issue of consent.

### A. Detention or Seizure

■ Initially, the Defendant argues that the evidence seized from his residence must be suppressed, because his detention after the resolution of the domestic dispute was unlawful.[10] In essence, Baker contends that the purpose of the officers' entry into his residence had been resolved, when they decided not to arrest him, and that, therefore, their continued detention of him violated the Fourth Amendment.[11] This Court cannot agree with Baker that he was so detained or seized.

---

10. The Court assumes that by detention the Defendant means that he had been seized.

11. It cannot be questioned that, at some point after he had signed the consent to search form, Baker was seized. With this argument,

In support of this contention, the Defendant relies upon the plurality opinion in *United States v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). In *United States v. Peters,* 194 F.3d 692 (6th Cir.1999), *cert. denied,* 528 U.S. 1174, 120 S.Ct. 1203, 145 L.Ed.2d 1106 (2000), the Sixth Circuit recognized that the plurality opinion in *Mendenhall* established the appropriate test for determining whether a person has been seized. Therein, the Sixth Circuit wrote:

"We conclude that a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled."

*Id.* at 697 (quoting *Mendenhall,* 446 U.S. at 554, 100 S.Ct. 1870). In *Peters,* the Sixth Circuit concluded by noting that "under the *Mendenhall* test, a person is 'seized' only when, by means of physical force or a show of authority, his freedom of movement is restrained." *Id.* (internal quotation marks and citation omitted).

■ Herein, Baker's freedom of movement, after the resolution of the domestic violence charge, was not restrained by means of physical force or a show of au-

thority. For instance, there is no evidence that any officer told him that he was not free to move about his house. In addition, Baker was not placed in handcuffs or otherwise touched by the officers. Rather than being told he would be arrested, officers informed Baker that he would *not* be arrested. Although the officers were armed with weapons when they entered Baker's house, they did not at anytime draw those weapons or display them to the Defendant. Moreover, there is no evidence that the officers used language or a tone of voice which might have conveyed to Baker that he had been seized. Nevertheless, Baker argues that Miller's testimony demonstrates that he had been detained. In particular, Baker points to that officer's testimony to the effect that he would not have left the residence, even if asked to do so by Baker, until after he had conferred with Minniear concerning the domestic dispute. *See* Doc. # 22 at 32. That testimony does not establish that the Defendant had been seized, since there is no evidence that Miller conveyed that intention to Baker. It is axiomatic that an officer's subjective intent is relevant to the issue of whether a person has been seized only if that intent has been conveyed to that person. *See United States v. Rose,* 889 F.2d 1490, 1493 (6th Cir.1989) ("[t]he subjective intent of the officers is relevant to an assessment of the fourth amendment implications of police conduct only to the extent that that intent has been conveyed to the person confronted") (citing *Mendenhall,* 446 U.S. 544, 554 n. 6, 100 S.Ct. 1870).

Accordingly, the Court rejects the Defendant's contention that the officers seized or detained him.[12]

the Defendant does not challenge that seizure; rather, he contends that he was detained while the officers were conducting the investigation of the domestic dispute and that the detention wrongfully continued after the investigation of that dispute had been completed.

**12.** As a consequence, it is not necessary to consider whether the evidence seized from Defendant's residence is the poisonous fruit of his illegal detention.

## B. Search

■ Alternatively, the Defendant argues that the Court must suppress the evidence seized from his residence, because Miller illegally searched that residence. In particular, Baker focuses upon the observations made by Miller in the kitchen, while he was waiting for Minniear to complete his interview with Williams. Since Miller's observations did not constitute a search, this Court cannot agree with Baker that they violated his rights under the Fourth Amendment.[13] In *Arizona v. Hicks,* 480 U.S. 321, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987), the Supreme Court noted that a police officer who conducts "a truly cursory inspection—one that involves merely looking at what is already exposed to view, without disturbing it—[does not conduct] a 'search' for Fourth Amendment purposes, and therefore does not even require reasonable suspicion."[14] *Id.* at 328. *See also, Horton v. California,* 496 U.S. 128, 133, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990) (noting that observing an object in plain view does not constitute an invasion of privacy and, therefore, is not a search); *United States v. Taylor,* 90 F.3d 903, 908 (4th Cir.1996) (noting that officer's observations from a place where he had a right to be did not constitute a search).

It cannot be questioned that Miller, Minniear and Carsner lawfully entered the Defendant's residence, when they responded to a call concerning a domestic dispute at that address. Once inside, they separated Baker and Williams, in order to investigate the dispute. After he had finished speaking with Baker, Miller walked down the hall to confer with Minniear. As he waited for Minniear to complete his interrogation of Williams, Miller stepped into the kitchen, which was next to the bedroom at the end of the hallway. From that vantage point, he was able to observe the items in that room in plain view. Accordingly, the Court concludes that Miller's observations did not constitute a search.

## C. Consent

■ It is axiomatic that, subject to certain "well-delineated" exceptions, the search of a residence and the seizure of evidence therefrom violate the Fourth Amendment, in the absence of a validly issued search warrant. *United States v. Jenkins,* 92 F.3d 430, 436 (6th Cir.1996), *cert. denied,* 520 U.S. 1170, 117 S.Ct. 1436, 137 L.Ed.2d 543 (1997). One of those exceptions is when officers obtain consent to search.[15] In *United States v. Erwin,*

13. The Defendant also contends that Miller's search was not supported by probable cause. Given that the Court concludes that the officer's actions did not constitute a search, it is not necessary to consider whether probable cause supported those actions.

14. In *Hicks,* officers entered the defendant's apartment, after a person living in the apartment immediately below his had been injured by a bullet which had traveled between the floor/ceiling which separated the two apartments. While in the defendant's apartment, an officer noticed expensive looking stereo equipment which looked out of place in the defendant's sparsely decorated apartment. The officer, suspecting that the equipment had been stolen, picked it up, in order to read and to record the serial numbers. He then reported the numbers to his headquarters and

was told that the equipment had been stolen. The officer seized the equipment, and the defendant was arrested. The United States Supreme Court concluded that the Arizona courts had properly suppressed the stereo equipment, because the act of picking it up to look at and to record the serial numbers constituted a search. Herein, there is no evidence that Miller did anything other than merely look at the items which were located in plain sight in the Defendant's kitchen.

15. Another exception is the "plain view doctrine," under which police officers may seize evidence which they discover from a location where they have a right to be and the incriminating nature of which is immediately apparent. *See e.g., Horton v. California,* 496 U.S. 128, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990). Herein, there is no evidence that the incrimi-

155 F.3d 818 (6th Cir.1998) (*en banc*), *cert. denied,* 525 U.S. 1123, 119 S.Ct. 906, 142 L.Ed.2d 904 (1999), the Sixth Circuit explained:

> "[W]hether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). The burden of proving that consent was voluntary is on the government. *Id.* at 222. "[C]onsent must be proved by clear and positive testimony, and, to be voluntary it must be unequivocal, specific, and intelligently given, uncontaminated by any duress or coercion." *United States v. Scott,* 578 F.2d 1186, 1188–89 (6th Cir.1978).

*Id.* at 823. In the present case, a review of the events which preceded the Defendant's signing of the consent to search form convinces this Court that his act was the product of implied duress or coercion, rather than being voluntary.

Officers Carsner, Minniear and Miller went to the Defendant's residence in order to investigate a domestic dispute. During the course of that investigation, Miller walked into the kitchen of the Defendant's home, where he observed items which raised his suspicions that something relating to controlled substances was occurring in that residence. There is no evidence that Miller asked Baker whether it was permissible for him to look around the kitchen. After resolving the domestic violence investigation, the officers informed Baker that he would not be arrested; however, rather than leaving the residence, they immediately began to investi-

gate what Miller had observed in the kitchen. There is no evidence that any officer asked Baker whether it was permissible to remain on the premises to conduct that investigation. On the contrary, Miller began to question Baker about what he had seen in the kitchen and ultimately asked the Defendant to take him to the back bedroom so that he could see the chemistry set to which Baker had alluded. In addition, Miller and Minniear decided to call the Chief of Police and Hutton to assist in the investigation of Miller's observations. There is no evidence that, when those officers arrived, Baker consented to their entry into his home or even that his permission was sought. Once Hutton had entered the Defendant's residence, Miller showed him what he had seen in the kitchen and bedroom. Once again, there is no evidence that the officers asked Baker whether it would be permissible for them to walk throughout his residence, in order to look into various rooms. Miller and Hutton then walked outside to confer about the appropriate course of action. When the two officers reentered the Defendant's residence, they neither sought nor received Baker's permission to do so. Immediately thereafter, the Defendant executed the consent to search form, at Hutton's behest. The foregoing convinces the Court that the officers essentially occupied the Defendant's residence, after the purpose for their initial entry had been completed. The officers' actions inside the Defendant's residence conveyed to him that they, rather than he, were the master of his castle. Creating such a coercive environment, with the officers going wherever and whenever they pleased in the Defendant's

---

nating nature of the items seized from the Defendant's house was readily apparent. On the contrary, Miller testified that, although he was suspicious that the items were associated with controlled substances, he was not certain

how. Therefore, the plain view exception to the warrant requirement does not render the warrantless seizure of items of Defendant's personal property lawful under the Fourth Amendment.

house, without even asking for permission to do so, compels this Court to find that the Government has failed to prove, by the preponderance of the evidence, that the Defendant voluntarily consented to the search of his home.

Moreover, in *United States v. Buchanan*, 904 F.2d 349, 355–56 (6th Cir.1990), the Sixth Circuit indicated that, when the warrantless entry into a defendant's home was not justified, his consent to search is presumed to be tainted and, therefore, invalid. Although the warrantless entry into the Defendant's residence by Carsner, Minniear and Miller was justified, there is no evidence (or even argument by the Government) that Hutton's entry or that officer's and Miller's reentry were justified. *See also, Bumper v. North Carolina*, 391 U.S. 543, 548–49, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968) (holding that the prosecution must prove that consent was "freely and voluntarily given" and that "[t]his burden cannot be discharged by showing no more than acquiescence to a claim of lawful authority").[16] The Defendant's signing of the consent form demonstrates no more than acquiescence in the face of conduct by law enforcement officials who assumed lawful authority for their actions. Therefore, even if the officers' actions inside the residence fail to demonstrate that Baker did not voluntarily consent to the search of his residence, the entry into that home by Hutton and the subsequent reentry by that officer and Miller tainted that consent and, thus, rendered it invalid.

Accordingly, the Court sustains the Defendant's Motion to Suppress Evidence (Doc. # 19). As a consequence, all evidence seized during the search of Baker's residence must be suppressed.

## II. Statements: Defendant's Motion to Suppress Statements (Doc. # 18)

■ The Defendant argues that his statements to Miller, prior to being given the warnings required by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), must be suppressed, because he was in custody when he made those statements.[17] For reasons which follow, this Court concludes that the Defendant was not in custody when he made those statements and that, therefore, questioning him prior to administering *Miranda* warnings did not violate his rights under the Fifth Amendment.

In *United States v. Phillip*, 948 F.2d 241 (6th Cir.1991), *cert. denied*, 504 U.S. 930, 112 S.Ct. 1994, 118 L.Ed.2d 590 (1992), the Sixth Circuit discussed the "in custody" predicate for the necessity that *Miranda* warnings be administered prior to questioning a suspect:

> The Supreme Court has established that *Miranda* warnings are necessary "only where there has been such a restriction on a person's freedom as to render him 'in custody'." *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977). Coercive environments not rising to the level of formal arrest or restraint on freedom of movement do not constitute custody within the meaning of *Miranda*. *See id.; see also United States v. Knox*, 839

---

**16.** In *Bumper*, officers told the defendant's grandmother, with whom he lived, that they had a search warrant for her house. As a result, the grandmother told the officers to come on in. The Supreme Court held that the grandmother's consent was invalid, because she had acquiesced to a claim of lawful authority.

**17.** According to Baker, his statements to Derenberger, after he had been given *Miranda* warnings, must be suppressed under the fruit-of-the-poisonous-tree doctrine, the poisonous tree being his illegal detention. Given that the Court has concluded that the Defendant was not detained, it rejects his argument that his statements to Derenberger were fruit of his illegal detention.

F.2d 285, 293 (6th Cir.1988), *cert. denied,* 490 U.S. 1019, 109 S.Ct. 1742, 104 L.Ed.2d 179 (1989). Consequently, the issue before us is whether there was a formal arrest or a "restraint on freedom of movement of the degree associated with a formal arrest." *California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) (quotation omitted). We must inquire "how a reasonable man in the suspect's position would have understood his situation." *Berkemer v. McCarty,* 468 U.S. 420, 442, 104 S.Ct. 3138 (1984) (emphasis added); *United States v. Macklin,* 900 F.2d 948, 951 (6th Cir.), *cert. denied,* 498 U.S. 840, 111 S.Ct. 116, 112 L.Ed.2d 86 (1990). *Id.* at 247. In *United States v. Salvo,* 133 F.3d 943 (6th Cir.), *cert. denied,* 523 U.S. 1122, 118 S.Ct. 1805, 140 L.Ed.2d 943 (1998), the Sixth Circuit noted that Courts of Appeals have held that when police question a suspect in a residence, he will oftentimes not be deemed to be in custody. *Id.* at 950. Herein, this Court has concluded, above, that the Defendant was not detained after the completion of the investigation of the domestic dispute. Of necessity, that conclusion causes the Court to find that the Defendant was not in custody when Miller questioned him. In *Berkemer v. McCarty,* 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984), the Supreme Court concluded that a driver, who had been stopped by a police officer and was questioned by the side of the road, was not in custody for purposes of *Miranda,* even though he had been seized and was not free to leave when questioned.

Accordingly, the Court overrules the Defendant's Motion to Suppress Statements (Doc. # 18).

Counsel listed below will note that the Court has scheduled a telephone conference call on Wednesday, January 8, 2003, at 4:45 p.m., for the purpose of discussing procedures leading to the conclusion of this prosecution. Prior to said conference, counsel for the Government must consider and notify the Court whether sufficient evidence remains to proceed with the prosecution of this litigation. If this question is answered in the negative, there will be no need for this conference call to take place.