[Cite as *State v. Kunkle*, 2023-Ohio-661.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
FULTON COUNTY

State of Ohio                                    Court of Appeals No.  F-22-009

      Appellee                              Trial Court No.  CRB2200019

v.

Ruben J. Kunkle                              **DECISION AND JUDGMENT**

      Appellant                            Decided:  March 3, 2023

* * * * *

T. Luke Jones, Fulton County Prosecuting Attorney, and
Mark L. Powers, Assistant Prosecuting Attorney, for appellee.

Gregory L. VanGunten, for appellant.

* * * * *

**ZMUDA, J.**

{¶ 1} This accelerated appeal is before the court from the judgment of the Fulton

County Western District Court, denying the motion to suppress of appellant, Ruben J.

Kunkle, and sentencing him to a two-year term of community control after appellant

entered a no contest plea to the charged offenses.  Finding no error, we affirm.

# I.    Facts and Procedural History

{¶ 2} In the early hours of January 22, 2022, Fayette police received a call to the department's non-emergency number, reporting a domestic violence incident at 419 E. Main Street.  Officer Daniel Renda answered the call around 5 a.m., and the caller gave her name and reported a physical domestic violence incident that had occurred at her brother-in-law's residence some time earlier, indicating her brother-in-law hit his girlfriend in the face "a little bit ago," and this was not the first incident.[1]  Officer Renda was familiar with appellant and his sister-in-law, based on previous interactions concerning appellant.  Renda drove to the residence to investigate the report.

{¶ 3} An altercation occurred at the front porch involving appellant and his girlfriend, and during this incident, Renda witnessed appellant slamming his girlfriend between the front door and door jamb.  He therefore attempted to arrest appellant for domestic violence, based on the witnessed act, but appellant managed to slip away and close himself inside the home.  Appellant then threatened Officer Renda with a weapon. By the time back-up arrived to assist Officer Renda, appellant had fled the scene.  A warrant issued for appellant's arrest.

{¶ 4} Appellant was later charged with domestic violence in violation of R.C. 2919.25(A), a misdemeanor of the first degree, aggravated menacing in violation of R.C.

---

[1] Officer Renda was the sole officer on duty for Fayette, working the night shift until 6:00 a.m.  The calls to the station were programmed to forward to the sheriff's department if unanswered.

2.

2903.21(A), a misdemeanor of the first degree, and resisting arrest in violation of R.C. 2921.33(A), a misdemeanor of the second degree. Appellant appeared for arraignment, entered a not guilty plea, and moved to suppress all evidence of crimes observed by Officer Renda due to his entry on the curtilage of the home (the front porch) without a warrant. In support, appellant relied on the authority of *Florida v. Jardines,* 569 U.S. 1, 133 S.Ct. 1409, 185 L.Ed.2d 495 (2013).

{¶ 5} At the hearing on appellant's motion to suppress, Officer Renda testified regarding the report he received from appellant's sister-in-law and his investigation at appellant's home. Officer Renda was at appellant's home within minutes of receiving the call. He parked his patrol car in the driveway and approached the front porch. He could hear yelling inside the home, and recognized the voices of appellant and appellant's sister-in-law. Although he heard arguing, Renda could not understand what was being said by either person, although he listened outside the home for four to six minutes before approaching the front door. After Officer Renda knocked three times, the victim, S.H., opened the door and stepped outside to the front porch to speak with him.

{¶ 6} After noticing S.H. had a black eye, Officer Renda asked her about the injury but S.H. would not acknowledge the black eye. He did not photograph any injury to S.H.'s face, but instead questioned S.H. regarding what was going on in the home. Appellant quickly came to the front door and confronted Renda, asking why he was there and yelling at him to leave his property. Officer Renda directed appellant to stay inside,

3.

indicating he would speak with appellant next, but appellant remained at the front door with his sister-in-law still in the home. S.H. was concerned about her dogs getting loose, and moved to reenter the home.

{¶ 7} As Officer Renda told appellant to go back inside the home and wait his turn, appellant told Renda, "No," and tried to slam the door closed while S.H. was between the door and the door jamb. Renda observed S.H. pinned in the door while appellant continued to close the door against her, and he heard S.H. crying out in pain. Renda intervened. He testified, "I was trying to pull her out of the doorway. I was getting in between the doorway trying to pull her out[.]" At the same time, Renda testified that he "tried to grab for the [appellant's] head" with his left arm, to place appellant in a hold. After a struggle, appellant broke free and the door closed with appellant inside and S.H. and Renda outside. Appellant's sister-in-law exited the home, soon after the incident. Renda called for back-up and waited outside with S.H. and appellant's sister-in-law until additional law enforcement arrived.

{¶ 8} As Officer Renda waited for back-up, appellant stood at the front door for a time and continued yelling to Renda, saying "get the fuck off my property you fucking pig," and yelling that he had a .45. S.H. and appellant's sister-in-law confirmed that appellant had firearms inside the residence. When other officers arrived, after a wait of 10 to 15 minutes, police made entry into the home through the back door. By this time, appellant had gone from the home and no arrest was made.

4.

**{¶ 9}** Next, S.H. testified. She admitted to an argument, but denied that any physical violence occurred the morning of January 22, 2022. S.H. also indicated that she and appellant had been drinking all night and she was still drunk at 5:00 a.m. She testified that appellant went to bed and she "was drunk and crying, being a hot drunk mess," and called appellant's sister-in-law, who came over. S.H. testified that appellant's sister-in-law had not been drinking and was sober the morning of the incident.

**{¶ 10}** S.H. answered the door after appellant's sister-in-law noticed someone on the front porch. S.H. saw a police officer standing there and she testified that he told her he was responding to a noise complaint, but she also admitted everything was a blur based on the alcohol she had consumed. S.H. denied that appellant shut the door on her or that she was in any pain, indicating she had no marks on her as a result of anything that happened, disclaiming any injury and disputing the black eye observed by Officer Renda. S.H. also testified that Officer Renda never asked to come inside the home, but spoke with her on the front porch. She recalled that Officer Renda reached inside the door to pull appellant outside, in order to arrest him. She refused to provide a statement to police regarding a domestic violence incident, and remembered few details of the events of that morning, based on her intoxicated state.

**{¶ 11}** No other witnesses testified at the hearing.[2]

---

[2] At the close of testimony, appellant's trial counsel indicated, "We had hoped to have [his sister-in-law] here, but she apparently was not able to make it."

{¶ 12} In its ruling, the trial court noted S.H.'s testimony that she was very drunk, and that she could not recall many details of the encounter on the porch or other details, such as when she had arrived home from drinking or why she and appellant were arguing. The trial court determined that Officer Renda witnessed appellant's offenses from the curtilage of the home, but Officer Renda was justified in entering the curtilage to investigate the report of a domestic violence incident. The court denied the motion to suppress, and determined the charges arose from conduct witnessed by Officer Renda after S.H. answered his knock on the front door, and that Officer Renda had a right to access the front porch "while on legitimate business."

{¶ 13} Following the denial of his motion to suppress, appellant withdrew his not guilty plea and entered a plea of no contest to the charged offenses. After finding appellant guilty, the trial court sentenced appellant to two years of community control, with a reserved jail sentence of 180 days, and ordered the sentence stayed pending appeal.

{¶ 14} Appellant filed a timely appeal, challenging the trial court's denial of his motion to suppress.

## II.    Assignment of Error

{¶ 15} Appellant asserts a single error on appeal:

The trial court erred in its denial of the defense motion to suppress and violated [appellant's] 4th Amendment Rights under the U.S. Constitution.

### III.    Analysis

{¶ 16} In challenging the trial court's decision, denying his motion to suppress, appellant mainly argues that Officer Renda was attempting to arrest him without a warrant, based on the report of a domestic violence incident, and entered the curtilage of the home to investigate that reported incident in violation of his Fourth Amendment rights.  Appellant argues that it was Officer Renda's attempt to enter the home to arrest him that caused S.H. to be trapped between the door and the door jamb, and Renda did not view any criminal conduct "from a place where he was legally entitled to be."

{¶ 17} Review of a trial court's denial of a motion to suppress involves mixed questions of law and fact.  *State v. Burnside,* 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8.  Because the trial court is "in the best position to resolve factual questions and evaluate the credibility of witnesses," we accept the trial court's factual findings if the record contains competent, credible evidence in support.  *Id.,* citing *State v. Mills,* 62 Ohio St.3d 357, 366, 582 N.E.2d 972 (1992).  "Accepting these facts as true, [we] must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard."  *Id.,* citing *State v. McNamara,* 124 Ohio App.3d 706, 711, 707 N.E.2d 539 (4th Dist.1997).

7.

**{¶ 18}** The Fourth Amendment to the United States Constitution and Article I, Section 14, of the Ohio Constitution protect individuals from unreasonable searches and seizures in places that the individual has a reasonable expectation of privacy, such as a home. *State v. Buzzard,* 112 Ohio St.3d 451, 2007-Ohio-373, 860 N.E.2d 1006, ¶ 13, fn.2. The curtilage of the home, or the area "immediately surrounding and associated with the home" is included as part of the home for purposes of the Fourth Amendment. (Citation omitted) *Florida v. Jardines,* 569 U.S.1, 6, 133 S.Ct. 1409, 185 L.Ed. 495 (2013).

**{¶ 19}** Appellant's argument on appeal is two-fold. He first contends that Officer Renda's entry to the curtilage of his home violated his Fourth Amendment right to privacy, because Renda was not entitled to enter onto his front porch, without exigent circumstances, based on an uncorroborated report of domestic violence. He next argues that Officer Renda violated his Fourth Amendment rights by attempting entry to his home to arrest him for a misdemeanor offense. In making this argument, appellant also contends it was Officer Renda's improper conduct that caused the incident in which S.H. was pinned by the door. In support of his argument, however, appellant does not specifically challenge the facts as determined by the trial court.

**{¶ 20}** The trial court determined that Officer Renda went to the home based on the phone call, received on the non-emergency line at the station, and appellant does not dispute this fact. The trial court also found that Officer Renda knocked at the door, S.H.

8.

stepped to the porch to speak with him, and when appellant objected to Renda's presence and S.H. attempted to re-enter the home, S.H. was closed in the door. Appellant acknowledges this series of events, but blames Renda for the incident with the door and disputes any injury to S.H. Finally, the trial court determined that appellant, after slipping from Renda's grasp, shouted threats regarding a firearm from within the home. Appellant fails to reference the firearm threats, and argues he was not "physical" in resisting arrest. Instead of challenging the facts, as determined by the trial court, appellant focuses his argument on facts that have no bearing on the issues on appeal.

{¶ 21} Appellant first argues a lack of exigent circumstances for Officer Renda's entry to his porch and his attempt to place him under arrest, focusing solely on the phone call reporting an earlier domestic violence incident. He notes the fact that his sister-in-law, in her phone call, never indicated when this earlier incident occurred and she placed the call to a non-emergency, unrecorded line. Furthermore, Officer Renda did not drive to the home with his lights and sirens activated and he did not hurry to knock at the door, pausing to listen on the porch for several minutes. Finally, appellant notes that, while Renda testified that he saw S.H.'s black eye, he failed to take a photograph of the bruising in accordance with procedure and S.H. never provided any information to substantiate the claimed domestic violence, reported by phone.

{¶ 22} None of these facts, noted by appellant, involve the domestic violence incident actually witnessed by Officer Renda from the front porch, with this conduct

leading to the charged offense. Moreover, the law is clear that Officer Renda did not need exigent circumstances to approach the home, step on the front porch, and knock on the front door in response to a report of domestic violence. "Unless a property owner has made express orders to the contrary regarding possible trespass, there is no rule that makes it illegal per se, or a condemned violation of an individual's right to privacy, for anyone to openly and peaceably walk up to the front door of a man's 'castle' with the honest intent to ask questions, whether the questioner be a pollster, salesman, or police officer." *State v. Tallent,* 6th Dist. Lucas No. L-10-1112, 2011-Ohio-1142, ¶ 14, citing *United States v. Taylor*, 90 F.3d 903 (4th Cir.1996). Without a warrant, Officer Renda was permitted to enter "only areas of the curtilage * * * impliedly open to the public." *Id.* at ¶ 15. Thus, like any citizen, Officer Renda could park in the driveway, traverse the sidewalk, and knock at the door to conduct legitimate business. (Citation omitted) *Id.*

{¶ 23} Based on the lack of emergency, however, appellant disputes Officer Renda's right to step on his porch and knock on his door, relying on *Florida v. Jardines,* 569 U.S.1, 133 S.Ct. 1409, 185 L.Ed. 495 (2013). In moving to suppress all evidence obtained by police after visiting his home, appellant argued that police "learned what they learned only by physically intruding" on his property, quoting the decision in *Jardines.* The facts in *Jardines,* however, are easily distinguished from the present case.

{¶ 24} In *Jardines,* the United States Supreme Court determined police conducted a warrantless search of a home, in violation of the Fourth Amendment. *Jardines* at 11-

10.

12.  The majority in *Jardines* did not address privacy issues, but instead focused on whether the use of a drug-sniffing dog was a "physical intrusion of a constitutionally protected area." *Id* at 5.  While recognizing the "implicit license" that permits a visitor to approach and knock, the court distinguished the use of "a trained police dog to explore the area around the home in hopes of discovering incriminating evidence[.]" *Id.* at 9.  In comparing the approach and knock situation to the police conduct in *Jardines,* the majority noted that "a visitor knocking on the door is routine (even if sometimes unwelcome); to spot that same visitor exploring the front path with a metal detector, or marching his bloodhound into the garden before saying hello and asking permission" exceeds the implied license for entry.  *Id.*

{¶ 25} In arguing the applicability of *Jardines,* appellant misstates the law, equating an entry to the porch to knock and inquire with an intrusive search to detect evidence.  Appellant also argues privacy rights that the majority in *Jardines* never addressed.  *See Jardines* at 11 (because use of the drug-sniffing dog was a "physical intrusion" and an impermissible search, "we need not decide whether the officers' investigation of Jardines' home violated his expectation of privacy[.]").  The concurring opinion in *Jardines,* however, did address both the search and privacy concerns, with the analysis equally applicable to the circumstances in this case:

For me, a simple analogy clinches this case—and does so on privacy as well as property grounds.  A stranger comes to the front door of your

home carrying super-high-powered binoculars. * * * He doesn't knock or say hello. Instead, he stands on the porch and uses the binoculars to peer through your windows, into your home's furthest corners. It doesn't take long (the binoculars are really very fine): In just a couple of minutes, his uncommon behavior allows him to learn details of your life you disclose to no one. Has your "visitor" trespassed on your property, exceeding the license you have granted to members of the public to, say, drop off the mail or distribute campaign flyers? Yes, he has. And has he also invaded your "reasonable expectation of privacy," by nosing into intimacies you sensibly thought protected from disclosure? *Katz v. United States*, 389 U.S. 347, 360, 88 S.Ct.507, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring). Yes, of course, he has done that too.

*Jardines*, at 12, 133 S.Ct.1409, 185 L.Ed.2d 495 (Kagan, J., concurring).

{¶ 26} Unlike the circumstances in *Jardines,* Officer Renda did not approach the front door with a detection device, with the intent to gather evidence from inside the home. Instead, he approached in order to knock at the front door, prompted by a report of possible domestic violence. Despite the lack of a warrant, an officer "may approach a home in hopes of speaking to its occupants, because that is 'no more than any private citizen might do.'" (Citation omitted) *Id.,* at the syllabus.

12.

{¶ 27} Appellant argues, however, that Officer Renda's minutes-long pause to listen to yelling voices, before he knocked, transformed his entry on the porch from legitimate police business into an impermissible search. He also argues no "plain view" exception, not because Renda's listening constituted an intrusive search, vis-à-vis *Jardines,* but because Renda's presence was prohibited within the curtilage. Appellant provides no supporting authority for his argument, and also points to no evidence "seized" as a result of this listening. Instead, appellant seeks to suppress all of the conduct that Renda personally observed after overhearing unintelligible, raised voices through the front door upon his approach.

{¶ 28} *Jardines* stands for the proposition that police may not obtain information by "physically intruding" on a person or home, beyond the implicit license to enter, in violation of constitutional protections. *Jardines* at 5-6. Here, Officer Renda approached the porch with implicit license to knock on the door while on legitimate business, and he perceived shouting voices using only his ordinary senses. Contrary to appellant's position, this is not an exigent circumstances case and the facts do not demonstrate an intrusive search into his home. Instead, the record supports the trial court's determination that Officer Renda entered the porch on legitimate police business. Once on the porch, Renda encountered appellant and witnessed him slamming his girlfriend in the door, causing S.H. to cry out in pain. The record demonstrates that, after witnessing appellant's conduct, Renda made an attempt to place appellant under control and under

13.

arrest. After appellant broke free of Renda's grasp and closed the door, appellant continued shouting at Renda, with threats of a firearm.

{¶ 29} As an additional matter, appellant argues that Officer Renda's attempt to enter his home to arrest him, *after* witnessing the offense of domestic violence, requires suppression of that eyewitness evidence of domestic violence. Again, appellant cites to no authority to support his argument, and his argument ignores the facts, evident in the record. Here, Officer Renda attempted to place appellant under control and arrest from his position at the front door, while simultaneously trying to pull S.H. to safety, away from appellant. Pursuant to R.C. 2935.03(B)(1), Renda had authority to place appellant under arrest for misdemeanor domestic violence, without a warrant. *See* R.C. 2935.03(B)(1) ("When there is reasonable ground to believe that * * * the offense of domestic violence as defined in section 2919.25 of the Revised Code, * * * has been committed within the limits of the political subdivision * **, a peace officer described in division (A) of this section may arrest and detain until a warrant can be obtained[.]"); *see also State v. Dunn,* 6th Dist. Lucas No. L-87-317, 1988 WL 81803 (Aug. 5, 1988), quoting *State v. Stacy,* 9 Ohio App.3d 55, 57, 458 N.E.2d 403 (9th Dist.1983) (arrest for misdemeanor offense authorized where the "offense involves violence, domestic violence, theft or illegal drugs."). Additionally, appellant does not claim evidence was seized *as a result of* this attempted arrest.

**{¶ 30}** Based on the record, and the undisputed, pertinent facts, the trial court correctly applied the law in denying appellant's motion to suppress. Accordingly, we find appellant's sole assignment of error not well-taken.

### IV.    Conclusion

**{¶ 31}** We affirm the judgment of the Fulton County Western District Court. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.

_____
JUDGE

Christine E. Mayle, J.

_____
JUDGE

Gene A. Zmuda, J.
CONCUR.

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.